**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| VIKKI T. ORDOGNE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-09-1872 |
| | § | |
| | § | |
| AAA TEXAS, LLC, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

Vikki Ordogne has sued her former employer, AAA Texas LLC, alleging violations of 42 U.S.C. § 1981. She alleges that AAA subjected her to a racially hostile work environment and retaliated against her by terminating her employment for complaining that a supervisor had discriminated against her. After discovery, AAA moved for summary judgment, asserting that the record shows that there was no racially hostile work environment as a matter of law and that Ordogne was discharged for forging a customer's name on an insurance application. (Docket Entry No. 24). Ordogne responded, (Docket Entry No. 27), and AAA replied, (Docket Entry No. 28).

Based on the pleadings; the motion, reply, and response; the summary judgment record; and the law, AAA's motion is granted in part and denied in part. The motion is granted as to Ordogne's hostile-workplace claim and denied as to her retaliation claim. A status conference is set for **April 18, 2011**, at 5:00 pm in Courtroom 11-B.

The reasons for this court's ruling are explained in detail below.

I.      **Factual Background**

Ordogne is a black female.  On April 25, 2005, she began her employment with AAA as a sales agent trainee.  After eight weeks of training, Ordogne began working at AAA's Champions office in Houston, Texas.  She worked in the Champions office for two weeks and then transferred to the Copperfield office.  At Copperfield, Ordogne became a sales agent.  (Docket Entry No. 27, Ex. A, Ordogne Depo., 40–42).

The events forming the basis of Ordogne's claims began in January 2008, when Jessica Yu became Ordogne's immediate supervisor.  Ordogne testified in her deposition, that within a month after Yu arrived at the Copperfield office, she began to treat Ordogne and another black female sales agent, Kathy Wilson, in a harassing manner.  (*Id.*, 114–15).  Ordogne asserted that Yu yelled at her and at Wilson after they failed to meet sales goals.  (*Id.*, 87–88).  Ordogne also testified that Yu treated her and Wilson worse than nonblack employees.  Ordogne testified that she could smell Yu's breath "three or four times" when Yu yelled at her and that she remembered Yu yelling "several" times.  (*Id.*, 113).  When asked to elaborate on Yu's treatment, Ordogne testified as follows:

> She was harder on me and Kathy than she was the whites . . . .
> For instance, I won a trip because of production to California.  When
> I came back from the trip through AAA, she gave me a verbal
> warning because of production.  I'm like, how can I write business
> when you guys gave me a trip to go to California.
>
> Sherry Casterline, who was a white female that works in that
> office, never made her numbers but one month, and she still works
> for the company.  It was—she would always cause trouble between
> me and Kathy, talk down at us like we were nothing.  And I would
> always try to not dispute anything she said because she would always
> stand before us and say, "You don't want to mess with me because
> you'll have hell to pay, and you better not go to HR, or you'll have
> hell to pay.  She could change Kathy's timecard when she wasn't
> supposed to tamper with it.  Kathy was—was treated far more worse
> than I was, but she treated us differently.

2

> As it came to when—she would go against the Privacy Act. She would just—if we tell her something in private, she would just blurt it out in front of everybody.  When she disciplined us, she disciplined us in front of everybody.  Everybody else she took in the office.
>
> It was very hostile.  There was another time, she told me to take a customer, because Gina was at lunch in the back.  I took the customer, gave him a quote, but I didn't write it.  And when Gina came out, she was, like, "Where's my customer?"  She said, Vikki took it, and I don't know why she did it.  And Kathy stood up and she said, "No, Gina, Kerri advised her to do that.  But she would always do that to try to make Kathy and me look bad, even in management meetings."  It was only me and Kathy that she always talked down to.

(*Id.*, 84–85).[1]  Ordogne also testified that Yu "made a lot of problems between me and Kathy [Wilson]" by saying "one thing to one of us, and then tell the other one another thing; and we would end up arguing about it."  (*Id.*, 83).

Wilson testified that she never saw Yu yell at a white employee or "get in [a white employee's] face."  (Docket Entry No. 27, Ex. C, Wilson Depo., 59).  When asked whether Yu treated black employees worse than nonblack employees, Wilson responded, "I feel like she treated me worse than—yes."  (*Id.*, 54).  In an affidavit, however, Wilson stated that Yu "subjected some of her employees to unnecessary treatment and mistreated them.  That unnecessary treatment was not limited to black or African American employees."  (Docket Entry No. 29, Ex. C, Wilson Second Aff., ¶ 3).  Wilson also testified that Yu treated Ordogne better than she treated Wilson.  As examples, Wilson testified that Yu would often "side" with Ordogne over Wilson; Yu did not reprimand Ordogne for taking deals she was not supposed to; and Yu did not reprimand Ordogne

---

[1]   During her deposition, Ordogne acknowledged that she did not attend any management meetings, and that her allegations as to Yu's comments during management meetings are based on hearsay.  (Docket Entry No. 27, Ex. A, Ordogne Depo., 85).

for "coming in and drawing unnecessary attention to herself [and] having outbursts in the office." (Docket Entry No. 27, Ex. C, Wilson Depo., 57–58).  Wilson testified that Ordogne had given Yu a "kickback" in the form of a $100.00 Visa check certificate she won, which Wilson thought violated company policies.  (*Id.*, 53).

Ordogne also alleged that Yu "verbally expressed her distaste for blacks" on one occasion. (Docket Entry No. 27, at 2).  While Ordogne, Wilson, and Yu were with other employees at a bowling event celebrating sales numbers, Yu confided in Ordogne and Wilson that she was having problems with her boyfriend.  Wilson asked Yu if she had ever thought about dating a black man, and Yu replied, "No I could never bring one of those home.  Oh, no.  My mom would have a fit." (Docket Entry No. 27, Ex A, Ordogne Depo., 94); (Docket Entry No. 27, Ex C, Wilson Depo., 94).

In October 2008, Ordogne called Stephanee Talley, a AAA human resources representative, and complained that Yu discriminated against her.  (Docket Entry No. 27, Ex. A, Ordogne Depo., 62, 112–13).  Wilson and another sales agent, Gina Besikcioglu, heard Ordogne make the call. (Docket Entry No. 27, Ex C, Wilson Depo.,  25–26; Ex. E, Besikcioglu Aff., ¶ 3).  Ordogne told Talley that she felt that she was being discriminated against because she had requested a lateral transfer to AAA's Fort Bend office and did not receive it.  Ordogne alleges that the transfer was given to an individual who had not applied for it.  Ordogne also told Talley that Yu was harassing her.  Ordogne testified that she told Talley that "Yu treated everyone badly.  But in particular, she treated me and [Wilson] . . . worse."  (Docket Entry No. 27, Ex. A, Ordogne Depo., 62).  AAA investigated Ordogne's allegations, offered her an interview for the Fort Bend office, and granted her request to be transferred to the Fort Bend Office in November 2008.  (*Id.*, 62–63).

4

Yu learned from her supervisor, Lisa Guertin, that Ordogne had lodged a complaint about her within two weeks of Ordogne's call to human resources. (Docket Entry No. 27, Ex B, Yu Depo., 78, 89–90). Wilson testified that soon after Yu learned about Ordogne's complaint, Yu said that she "felt betrayed" and "wasn't happy" that Ordogne had spoken with human resources. (Docket Entry No. 27, Ex. C, Wilson Depo., 38).[2]

The events leading to Ordogne's discharge began on December 3, 2008, after her transfer to the Fort Bend office. On December 3, Wilson received a call from a AAA customer, Jeffrey Watson. Watson stated that he wanted to purchase a new renter's insurance policy. Wilson checked AAA's system and saw that Watson already had a renter's policy. Watson denied that he did. (*Id.*, 101–02). Wilson talked to Yu, who instructed her to sell Watson a new policy and cancel the policy on file. (*Id.*, 105). AAA's information system showed that Ordogne had uploaded a renter's policy for Watson even though he had not paid the insurance premiums. Ordogne acknowledged that she had processed the application. (Docket Entry No. 27, Ex. A, Ordogne Depo., 127). Besikcioglu and Wilson both stated that it was normal for sales agents to upload unpaid insurance policies and that Yu instructed sales agents to do so. (*Id.*, 99); (Docket Entry No. 27, Ex. E, Besikcioglu Aff., ¶ 5).

Yu sent an email to Mark Ramsey, Ordogne's supervisor in the Fort Bend office, and to Guertin. The email stated that Ordogne had "bound" an application without taking money on the policy. (Docket Entry No. 27, Ex. B, Yu Depo., 88–89, Depo. Ex. 3). Yu testified that she was

---

[2]   In an affidavit dated August 18, 2009, Wilson stated that Yu also said, "It's going to be payback. It is going to be hell to pay for Vikki going to HR and going over my head," at this time. (Docket Entry No. 27, Ex. D, Wilson Aff.). In her deposition, Wilson testified that Yu did not make this statement until later. (*Id.*, Ex. C, Wilson Depo., 68). Wilson prepared a second affidavit on February 12, 2010. In her second affidavit, she stated that her previous affidavit contained "misstatements of alleged fact." (Docket Entry No. 29, Ex. C, Wilson Second Aff., ¶ 2). She stated that "[t]he affidavit was prepared by someone else who I believe works or works in the law office of the attorneys who are representing Vikki T. Ordogne" and that when she signed the first affidavit, she "did not read it carefully or thoroughly." (*Id.*).

aware of Ordogne's human resources complaint about her when she sent this email.  (*Id.*, 101–02).
Yu later obtained a copy of Watson's insurance application.  (Docket Entry No. 27, Ex. C, Wilson
Depo., 107).  Wilson testified that when Yu obtained the copy, she said, "It's going to be payback.
It is going to be hell to pay for Vikki going to HR and going over my head." (*Id.*, 69).[3]  Yu did not
believe that the signature on the rental insurance policy application was in fact Watson's.  AAA's
Texas policy on "Sales Related Employee Conduct That Can Result in Termination" states that if
an AAA employee writes a customer's signature or initial on an insurance application, that is
grounds for immediate termination.  (Docket Entry No. 24, Ex. A, Ordogne Depo., 138).  Yu asked
Wilson to get a copy of Watson's driver's license, which Wilson did.  The signature on the
application and the signature on the driver's license did not appear to match.  (*Id*., 128).  Watson
denied having signed the application.

Yu provided Ramsey, Guertin, and Talley with copies of different documents bearing
Watson's signature.  (Docket Entry No.27, Ex B, Yu Depo.,106–08).  Yu asserts that she had no
additional involvement after providing these documents.  (*Id.*).  On December 19, 2008, Guertin met
with Ordogne to interview her about Watson's policy.  Guertin showed Ordogne an insurance policy
Watson had later purchased and signed.  Guertin also showed Ordogne the policy she had processed
for Watson.  Ordogne acknowledged that she processed the policy but denied forging the signature
on the application.  Guertin suspended Ordogne for three days, telling her that she needed to leave
the office while the investigation was conducted.  On December 23, 2008, AAA fired Ordogne.
(Docket Entry No. 27, Ex. A, Ordogne Depo., 142–45).

---

[3]   Wilson also testified that Yu said something like, "I'll teach her . . . payback . . . Boom.  I got her . . . ."
(Docket Entry No. 27, Ex. C, Wilson Depo., 107–08).

Ordogne filed this suit on June 16, 2009.  Ordogne alleged that AAA violated § 1981 by creating a hostile work environment and by retaliating against her for complaining that Yu had discriminated against her and that AAA had denied her a transfer based on her race.[4]  (Docket Entry No. 18).  After the close of discovery, AAA moved for summary judgment.

AAA argues that the facts supporting Ordogne's hostile work environment claim are insufficient as a matter of law to raise a fact issue.  As to the retaliation claim, AAA argues that Ordogne's complaints to Guertin were not protected activities, and in the alternative, that Ordogne cannot raise a fact issue as to whether AAA's stated reason for her termination—failure to follow AAA policies—was pretextual.  Ordogne responds that Yu treated black employees differently and did so over a long enough period that her conduct could be described as "pervasive"; that her complaints to Guertin were protected; and that she can raise a fact issue as to pretext under the "cat's paw" theory.

## II.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See*

---

[4]    Ordogne also asserted a failure to promote claim, but withdrew this claim in her response to AAA's motion for summary judgment.  (Docket Entry No. 27, at 1).

*Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case.  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).   "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."  *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim.  *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).   "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"  *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.     The Hostile Work Environment Claim

### A.        The Legal Standard

Ordogne alleges that AAA maintained a hostile work environment, in violation of § 1981. Ordogne does not assert a Title VII claim.  The same standard applies under Title VII and § 1981. *Williams-Boldware v. Denton Cnty.*, No. 4:09-CV-591, 2010 WL 2991164, at *8 (E.D. Tex. June

15, 2010) (citing *Felton v. Polles*, 315 F.3d 470, 483–84 (5th Cir. 2002)).  The elements of a hostile

work environment claim are that: (1) the plaintiff belongs to a protected group; (2) she was subjected

to unwelcome harassment; (3) the harassment complained of was based on membership in the

protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5)

the defendant knew or should have known of the harassment, yet failed to take prompt remedial

action.  *Felton*, 315 F.3d at 484.  The fifth element is not required when the alleged harasser is a

supervisor with immediate or successively higher authority over the plaintiff.  *See Celestine v.*

*Petroleos de Venezuella SA*, 266 F.3d 343, 353-54 (5th Cir. 2001) (citing *Faragher v. City of Boca*

*Raton*, 524 U.S. 775, 807 (1998)), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v.*

*Morgan*, 536 U.S. 101 (2002).

The Supreme Court has explained that in determining whether workplace conditions are a

hostile work environment, courts must consider "the frequency of the discriminatory conduct; its

severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with the employee's work performance."  *Harris v. Forklift*

*Systems, Inc.*, 510 U.S. 17, 23 (1993).  For harassment to be actionable, it must be "sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive working

environment."  *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) (internal quotation marks

and citation omitted); *Watkins v. Texas Dept. of Criminal Justice*, 269 F. App'x 457, 463–64 (5th

Cir. 2008).  "To be actionable, the challenged conduct must be both objectively offensive, meaning

that a reasonable person would find it hostile and abusive, and subjectively offensive, meaning that

the victim perceived it to be so."  *Harvill v. Westward Commc'ns LLC*, 433 F.3d 428, 434 (5th Cir.

2005) (citing *Shepherd v. Comptroller of Pub. Accounts*, 168 F.3d 871, 874 (5th Cir. 1999)).  The

9

Supreme Court has made clear "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788 (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 82 (1998)).

### B.     Analysis

Ordogne asserts that she was subject to a racially hostile work environment while working under Yu's supervision from January to November 2008. Ordogne testified that Yu yelled at her, talked down to her, reprimanded her in front of coworkers, and gossiped about her. Ordogne also testified that Yu did not engage in this behavior towards nonblack employees. But when asked about this during her deposition, Ordogne admitted that Yu only yelled at her "several" times. (Docket Entry No. 27, Ex. A, Ordogne Depo., 113). Such infrequent occurrences over a nine-month period do not support a hostile workplace claim. *See Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317 (5th Cir. 2004) (finding that the plaintiff's allegations of inappropriate contacts were insufficiently frequent to support a hostile work environment claim because the plaintiff could only recall "two or three or six" incidents); *Memon v. Deloitte Consulting, LLP*, 2011 WL 1044051, at *13 (S.D. Tex. Mar. 17, 2011) ("In general, sporadic or isolated workplace interactions are not actionable ultimate employment decisions, as required for a race or religious discrimination claim, including a hostile work environment claim."); *Simmons v. Cadence Design Sys., Inc.*, 2007 WL 4104373, at *13 (N.D. Tex. Nov. 16, 2007) (finding that "isolated incidents and offhand comments" do not support a hostile work environment claim). Title VII does not require supervisors to be polite, or even civil. *Faragher*, 524 U.S. at 788; *see also Butler v. Ysleta Indep. Sch. Dist.*, 161 F.3d 263, 270 (5th Cir.1998) ("Contrary to the children's rhyme, all insults, like sticks and stones can

hurt, but this does not mean that all insults are tortious."); *Soliz v. Assocs. in Med., P.A.*, Civ. A. No. H-06-2785, 2007 WL 2363304, at *5–*6 (S.D. Tex. Aug.17, 2007) (holding that yelling at the plaintiff in front of other employees did not create a hostile work environment).[5]

Ordogne also alleged that Yu gossiped about her. But Ordogne acknowledged that Yu gossiped about all employees. (Docket Entry No. 24, Ex. A, Ordogne Depo., 84–86, 90, 106, 111–12). Ordogne testified that the working environment under Yu's supervision was "hostile and unbearable for everyone." (*Id.*). Wilson, another black female employee, also testified that Yu was more unpleasant to Wilson than to Ordogne and that she subjected both non African American and African American employees to unnecessary treatment. (Docket Entry No. 29, Ex. C, Wilson Second Aff., ¶ 3). The testimony shows that Yu's gossip and unpleasant treatment of others was not related to Ordogne's race and cannot support a hostile-work environment claim. *See Vallecillo v. U.S. Dep't of Housing and Urban Dev.*, 155 F. App'x 764, 767 (5th Cir. 2005) (affirming summary judgment on a hostile work environment claim when the harassment was not based on the plaintiff's race or national origin); *Cooper v. Wal-Mart Transp., LLC*, Civ. Act. No. H-08-0085, 2010 WL 2522625, at *8 (S.D. Tex. Jun. 18, 2010) (finding that the defendant was entitled to summary judgment where there was no evidence demonstrating that much of the alleged conduct was based on the plaintiff's race).

---

[5]     Ordogne cites two Fifth Circuit decisions to argue that while Yu's actions may not have been sufficiently severe to support a hostile work environment claim, they were sufficiently pervasive. In *Lauderdale v. Tex. Dep't of Crim. Justice, Institutional Div.*, 512 F.3d 157, 164 (5th Cir. 2007), the frequency of the alleged discriminatory comments was much higher than the few incidents Yu identified in her deposition. In *Lauderdale*, the court held that a male employer's ten to fifteen phone calls a night for four months to a female employee, some with explicit sexual overtones, supported a claim of a hostile work environment. The second case, *Long v. Eastfield College*, is inapplicable. In *Long*, the court found that the plaintiff's allegations did not support a hostile-work environment claim, only a reasonable belief that the employee had made a hostile-work environment claim, which the court found was a protected activity under Title VII. 88 F.3d 300, 306, 309 (5th Cir. 1996).

Ordogne also alleges that Yu "talked down" to her.  Courts have held that similar allegations do not support a hostile workplace claim.  *See Boyd v. Presbyterian Hosp.*, 160 F. Supp. 2d 522, 541–42 (S.D.N.Y. 2001) (holding that while an African-American nurse was subjected to gossip, lower performance evaluation, and intense scrutiny of her work performance that were annoying, bothersome, and stress-inducing, they did not create a racially hostile work environment); *Padilla v. Carrier Air Conditioning*, 67 F. Supp. 2d 650, 661 (E.D. Tex.1999) (holding that close scrutiny of plaintiff's work combined with the employer's remarks were insufficient to establish racial harassment).

Ordogne points to Yu's statement that she would never "bring a black man home" because it would upset her mother to support the hostile work environment claim.  Although this may evidence racial bias on Yu's part, a hostile work environment claim is based on the severity and pervasiveness of what happens in the workplace.  The case law on when workplace comments give rise to a hostile work environment claim shows a far greater degree of harassment than the record discloses here, both in terms of the frequency and the nature of the offensive communications. *Compare Walker v. Thompson,* 214 F.3d 615, 619–22 (5th Cir. 2000) (holding that the plaintiff could survive summary judgment based on evidence of years of inflammatory racial epithets, including "nigger" and "little black monkey"); *with Baker v. FedEx Ground Package Sys., Inc*., 278 F. App'x 322, 329 (5th Cir. 2008) (a supervisor's comments to an African-American employee that "she did not want to work with people like" employee and that "whites rule" were not sufficiently severe to establish a race-based hostile work environment); *Turner*, 476 F.3d at 348 (holding that a supervisor's infrequent and isolated comments directed to the plaintiff about "ghetto children" and other racially insensitive remarks did not rise to the level of severe or pervasive harassment);

*Septimus*, 399 F.3d at 612 (holding that one two-hour "harangue" by a supervisor and his use of a mocking tone on one occasion, and another supervisor's comment comparing the plaintiff to a "needy old girlfriend" did not amount to a severe or pervasive working environment); *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 653 (8th Cir. 2003) (occasional racial comments were insufficient for a hostile work environment claim).

On balance, the nature and frequency of the incidents Ordogne complains about fall short of the level the cases require to raise a fact issue as to whether there was harassing conduct sufficiently sever or pervasive to affect her working conditions. *Compare EEOC v. WC & M Enters., Inc.*, 496 F.3d 393, 400-01 (5th Cir. 2007) (summary judgment was not warranted when a Muslim employee alleged that coworkers called him "Taliban" multiple times a day, called him "Arab" though he was Indian, and mocked his religious beliefs and practices, and that a supervisor wrote that he was "acting like a Muslim extremist" in an official reprimand), *with Kang v. Bd. of Supervisors of La. State Univ.*, 75 F. App'x 974, 976–77 (5th Cir. 2003) (summary calendar) (holding that unjustified criticisms of an employee in front of coworkers does not as a matter of law create a hostile work environment).  AAA's motion for summary judgment on Ordogne's hostile-work environment claim is granted.

## IV.     The Retaliation Claim

### A.      The Legal Standard

The same standard applies for retaliation under both Title VII and § 1981.  *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).  Title VII makes it an unlawful employment practice for an employer to "discriminate against any of his employees . . . because [the employee] has made a charge . . . under this subchapter." 42 U.S.C. § 2000e-3(a).  The elements of a *prima*

*facie* showing of retaliation under Title VII are that the plaintiff: "(1) engaged in an activity protected by Title VII; (2) [she] was subjected to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse employment action." *Davis v. Dall. Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004). For the purpose of a retaliation claim, an "adverse employment action" is defined as an action that "a reasonable employee would have found . . . [to be] materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 126 S. Ct. 2405, 165 L.Ed.2d 345 (2006) (internal quotations omitted), abrogated on other grounds by *Burlington*, 548 U.S. 53, 126 S. Ct. 2405, 165 L.Ed.2d 345.

If a plaintiff makes a *prima facie* showing, the burden shifts to the defendant to proffer a legitimate nonretaliatory reason for the employment action. *Davis*, 383 F.3d at 319. If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation. *Id.* The standard of proof on the causation element of a Title VII claim is that the adverse employment action taken against the plaintiff would not have occurred "but for" her protected conduct. *Septimus v. Univ. of Hou.*, 399 F.3d 601, 608 (5th Cir. 2005); *Pineda v. United Parcel Serv., Inc.*, 360 F.3d 483, 487 (5th Cir. 2004); *see also Smith v. Xerox Corp.*, 602 F.3d 320, 329 (5th Cir. 2010) (holding that the Supreme Court's decision *Gross v. FBL Fin. Servs., Inc.*, ---- U.S. ----, 129 S. Ct. 2343 (2009) does not impact the Fifth Circuit's previous interpretations of Title VII).

### B. Analysis

AAA argues that Ordogne has not made a *prima facie* showing of discrimination because she did not engage in protected activity. AAA argues that Ordogne's complaint that Yu treated her

14

worse than nonblack coworkers and her complaint that discrimination prevented her transfer were not based on a reasonable belief of unlawful discrimination.  (Docket Entry No. 24, at 14).

The Fifth Circuit has made it clear that a retaliation claim requires "at least a reasonable belief" that the practices the plaintiff opposed or complained about were unlawful under Title VII. *See Long v. Eastfield Coll.*, 88 F.3d 300, 304 (5th Cir. 1996); *Mota v. Univ. of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 519 (5th Cir. 2001); *see also Bd. of County Comm'rs, Fremont County, Colo. v. EEOC*, 405 F.3d 840, 852 (10th Cir. 2005) ("Thus, the issue is not [the plaintiff's] subjective reasons for filing his original complaint of 'third-party sexual harassment' with the EEOC, but rather, whether he had a good faith belief that the conduct complained of violated Title VII."); *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1312 (11th Cir. 2002) ("A plaintiff must not only show that he subjectively (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was objectively reasonable in light of the fact and record presented.").

The evidence shows that Ordogne called a human resources representative and alleged that Yu treated her unfairly and that AAA refused to transfer her because of her race.  (Docket Entry No. 27, Ex. A, Ordogne Depo., 62, 112–13).  Courts have held that good-faith discrimination complaints to human resources are protected activities.  *See Foster v. Solvay Pharms.*, 160 F. App'x 385, 388 (5th Cir. Dec. 23, 2005) (finding that employee's email to human resources stating that he believed executive's selection of a male over a female for a company award constituted gender discrimination was a protected activity); *Fierros v. Tex. Dep't of Health*, 274 F.3d 187, 194 (5th Cir. 2001), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92 (2003) (noting that filing an internal discrimination complaint is a protected activity); *Beckham v. Construction*

*Materials, Inc.*, 2005 WL 2177247, at *7 (W.D. La. Sept. 8, 2005) (finding that complaint to human resources of an inappropriate comment was a protected activity).  Based on this evidence, a jury could find that Ordogne engaged in a protected activity.

AAA also argues that even if Ordogne had a good-faith belief that Yu discriminated against her, that belief was not objectively reasonable.  *See Weeks*, 291 F.3d at 1312.  AAA cites the Supreme Court's decision in *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001).  In *Breeden*, the plaintiff claimed that she was retaliated against for complaining about a male supervisor's reaction to a sexually explicit statement in a document they were reviewing.  Applying the rule that Title VII protects "employee opposition not just to practices that are actually made unlawful by Title VII, but also to practices that the employee could reasonably believe to be unlawful," the Court held that "no reasonable employee could have believed the single incident . . . violated Title VII's standards."  *Id.* at 272.  The Court noted that the plaintiff's job required her to review sexually explicit statements to screen job applicants, her coworkers were subjected to the same requirement, and she admitted that it did not upset her to read the statement.  *Id.*

Compared to the *Breeden* plaintiff, who complained of a single incident and admitted that she was not bothered by it, Ordogne has identified more evidence showing that her belief of unlawful discrimination was reasonable.  Ordogne alleged that on several occasions, Yu treated her differently from nonblack employees.  She alleged that Yu yelled at her, but never yelled at nonblack coworkers; talked down to her, but never talked down to nonblack coworkers; and publically reprimanded her, but did not publicly reprimand nonblack coworkers.  Ordogne also alleged that Yu treated Wilson, another black employee, similarly.  While the record showed that Ordogne's work environment was not hostile as a matter of law, there is a fact issue as to whether

she had a reasonable belief that Yu discriminated against her.  That Ordogne's discrimination allegations are insufficient as a matter of law does equate to a conclusion that her complaint was not a protected activity.  *See Solvay*, 160 F. App'x at 388–89 (finding that an employee's email to human resources stating that he believed an executive's selection of a male over a female for a company award constituted gender discrimination was a protected activity and also finding that there was no evidence that his complaint resulted in an adverse employment decision); *Long v. Eastfield College*, 88 F.3d 300, 305–06, 308–09 (5th Cir. 1996) (finding that the plaintiff's complaint about a supervisor's treatment was a protected activity while finding no hostile work environment); *Beckham*, 2005 WL 2177247, at *7 (finding that a complaint to human resources about an inappropriate comment was a protected activity and also finding that there was no evidence of a causal connection between the complaint and the termination of the plaintiff's employment).

AAA argues that even if Ordogne can make a *prima facie* showing of discrimination, she cannot demonstrate that the stated reason for her job termination—AAA's belief that she forged Watson's signature on an insurance application—is pretextual.  AAA emphasizes that Guertin, consulting with other human-resources personnel, independently decided to terminate Ordogne's employment, and that Yu had no involvement in the decision.  AAA cites a number of Fifth Circuit decisions holding that "the causal link between the protected conduct and termination is broken where the official with final authority to fire employees conducts an 'independent investigation' in the course of reaching his or her decision."  *See, e.g.*, *Mato v. Baldauf*, 267 F.3d 444, 450 (5th Cir. 2001).

The Supreme Court's decision in *Staub v. Proctor Hospital*, — S. Ct. —, 2011 WL 691244 (2011), clarifies that an employer may be liable for retaliation even if there was no evidence of bias

17

on the part of the final decisionmaker if that decisionmaker took into account a biased negative statement or evaluation about the plaintiff by someone not involved in the challenged employment decision. *Staub* arose under the Uniformed Services Employment and Reemployment Rights Act, 38 U.S.C. § 3411(a), not Title VII.  The Court noted that the statute is "very similar to Title VII." *Staub*, 2011 WL 691244, at *4.  Both statutes prohibit adverse actions in which racial or sexual bias is a motivating factor." *Id.* (comparing 38 U.S.C. § 4311(a) with 42 U.S.C. § 2000e-2(m)).  The question in *Staub* was whether the employer could be liable when the manager responsible for the termination decision relied in part on a supervisor's animus-driven performance evaluation, even if that supervisor was not included in the termination decision.  The Court held that "if a supervisor performs an act motivated by [illegal] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Id.* at *7 (emphasis in original; footnotes omitted).  The presence of another basis for termination, such as an independent investigation by the person who made the decision, does not necessarily save the employer from liability.  The Court explained that "the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.* at *6.

The record includes evidence that Yu, Ordogne's former supervisor, informed  Ramsey, Ordogne's current supervisor, and Guertin, the decisionmaker, that there was a problem with an insurance application processed by Ordogne.  The record includes evidence that Yu reported Ordogne's actions and subsequently provided additional documentation.  The record includes evidence that Yu was motivated by the desire to retaliate against Ordogne for complaining to human

18

resources.  Wilson testified that when Yu obtained the copy of the insurance application, she said, "It's going to be payback.  It is going to be hell to pay for Vikki going to HR and going over my head."  (*Id.*, Ex. C, Wilson Depo., 98–99).  AAA contends that Yu made this comment because she was upset with Ordogne for transferring, not because she was upset with Ordogne for her discrimination complaint.  But this evidence supports Ordogne's contention that Yu reported her alleged misconduct and forwarded documents to Guertin in retaliation for Ordogne's discrimination complaint.  In addition to Yu's comments to Wilson, there is also evidence about Yu's reaction to learning that Ordogne had complained to human resources about her.  Wilson testified that soon after Yu learned that Ordogne had lodged a complaint, Yu told Wilson that she "felt betrayed" and that she "wasn't happy" that Ordogne had spoken with human resources.  (Docket Entry No. 27, Ex. C, Wilson Depo., 38).  Finally, there is evidence that Yu instructed other employees to upload applications without requiring payment.  The record includes sufficient evidence that Yu performed "an act motivated by [illegal] animus," which she "*intended . . .* to cause an adverse employment action," and that Yu's acts were "a proximate cause of the ultimate employment action," to preclude summary judgment on the retaliation claim.  *Staub*, 2011 WL 691244, at *6.

AAA points out that Ordogne has produced no evidence showing that Yu's, Guertin's, or Ramsey's belief that Ordogne forged Watson's signature was unreasonable.  In the context of a discharge for failure to comply with a work rule, "the issue is whether the employer reasonably and in good faith believed that the violation occurred."  *Bardwell v. Global Sante Drilling Co.*, No. H-06-0171, 2007 WL 2446801, at *11 (S.D. Tex. Aug. 23, 2007); *see also Waggoner v. City of Garland*, 987 F.2d 1160, 1165–66 (5th Cir. 1993) ("[T]he inquiry is limited to whether the employer believed the allegation in good faith and whether the decision to discharge the employee was based

19

on that belief."); *McCombs v. MS Commc'ns Am., Inc.*, No. CIV.A. SA00CA0623NN, 2002 WL 1491724, at *7 (W.D. Tex. Apr. 23, 2002) ("The critical issue . . . is whether the defendants believed in good faith that the plaintiff had committed the offensive behavior and that plaintiff was terminated for that reason." (citing *Waggoner*, 987 F.2d at 1165)).  But, consistent with *Staub*, courts in this circuit have also observed that, "[t]he question . . . whether the decision is made with discriminatory motive."  *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir.1995); *see also Austin v. Wal-Mart Stores Tex., LP*, No. 3:05 CV 1687 M, 2006 WL 2859367, at *7 n.9 (N.D. Tex. Oct. 5, 2006) ("Wal-Mart's motive is the focus of the Court's inquiry: The truth of the under-ringing allegation is of import only as it implicates that motive.").  But under *Staub*, even though the decisionmaker may have had a reasonable, good-faith belief that Ordogne had forged Watson's signature, the evidence showing that Yu was motivated by a discriminatory animus when she reported Ordogne, that she intended to cause the termination of Ordogne's employment, that Yu had previously instructed agents to upload unpaid insurance policies, and that Yu's report was a "but for" and proximate cause of Ordogne's termination, create a fact issue as to pretext.  AAA's motion for summary judgment is denied as to Ordogne's retaliation claim.

## V.   Conclusion

AAA's motion for summary judgment, (Docket Entry No. 24), is granted in part and denied in part.  The motion is granted as Ordogne's hostile-workplace claim and denied as to Ordogne's retaliation claim.  A status conference is set for **April 18, 2011**, at 5:00 pm in Courtroom 11-B.

SIGNED on March 28, 2011, at Houston, Texas.

Lee H. Rosenthal

United States District Judge